**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS COATES,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.:   19-CV-5143** |
| | : | |
| **METROPOLITAN PROPERTY AND** | : | |
| **CASUALTY INSURANCE COMPANY** | : | |
| **Defendant.** | : | |

**<u>MEMORANDUM</u>**

**SITARSKI, M.J.**                                                               **August 30, 2022**

Presently pending before the Court is Defendant's Motion *In Limine* to Preclude Report

and Testimony of Plaintiff's Expert, Jeff Olen (Mot. To Preclude, ECF No. 22), Plaintiff's

response thereto (Resp., ECF No. 24), Defendant's reply brief in support of its motion (Reply

Br., ECF No. 30), and Defendant's supplemental reply brief in further support of its motion to

preclude (Suppl. Reply Br., ECF No. 37).[1]  For the reasons that follow, Defendant's motion shall

be **GRANTED**.


**I.      FACTUAL AND PROCEDURAL HISTORY**

Thomas Coates is the owner of property located in Warrington, Pennsylvania

("Property") insured under a homeowner's insurance policy ("Policy") issued by Metropolitan

Property and Casualty Insurance Company ("MetLife").  (Compl., ECF No. 1-1, at ¶ 3).  On or

about February 24, 2019, a skid steer operated by Coates allegedly struck a retaining wall on the

Property, allegedly causing the wall to collapse.  (*Id.* at ¶ 4; Br., ECF No. 22-1, at 1; Resp., ECF

---

[1]  The Honorable C. Darnell Jones, II referred the matter to me for disposition pursuant to
28 U.S.C. § 636(b)(1)(A).  (Order, ECF No. 34).

No. 24, at 5).  Coates submitted a claim under the Policy.  (Compl., ECF No. 1-1, at ¶ 5).

MetLife denied Coates's claim, stating that "this loss is not covered under the policy" pursuant to the exclusions "for wear, tear, and deterioration" and "for loss contributed to or aggravated by earth movement, and ground and/or surface water which exerts pressure on an other structure."  (Resp., ECF No. 24, Ex C. at 1).  It purportedly relied on a June 12, 2019 report prepared by Joseph S. Graci, P.E., a public engineer with Franklin Engineering, Inc. who inspected the Property on June 6, 2019.  (*Id.* Ex. D at 2).  Graci opined that the "root cause" of the wall's collapse was its age, wear and tear, exposure, a lack of a proper drainage system, the very weak, decayed, water-damaged condition of the wooden members of the wall, and the lack of proper maintenance.  (*Id.* at 3).  According to Graci, the skid steer "may have been a contributing factor if it indeed hit the wall but could not be the root cause of the total or substantial collapse of the wall."  (*Id.* at 4).

Alleging a claim of breach of contract, Coates has submitted an expert report dated August 17, 2020 from Jeff Olen of First Choice Public Adjusters.  (Mot. to Preclude, ECF No. 22-4, Ex. A).  According to his report, Olen is a public insurance adjuster licensed in Pennsylvania.  (*Id.* at 1).  "As a contractor specializing in Retaining walls, I have built retaining walls from scratch, I have replaced retaining walls that failed, as well as replaced new walls improperly installed by another contractor."  (*Id.* at 1).  These walls were between 2' to 22' tall in various soil conditions, some walls "have had a flowing stream down below the wall and one wall even had a hidden underground stream that needed to be managed."  (*Id.*).  Work on the wall with the hidden underground stream earned Olen the award of "Retaining Wall Builder of the Year" from the retaining wall manufacturer.  (*Id.*).  Olen's CV stated that Olen has been a field adjuster with Metro Public Adjustment since 2016, was an insurance inspector with

Accelerated Inspection Service from 2014 to 2017, and worked as an apprentice home inspector by NJ Best Home Inspection in 2014.  (Resp., ECF No. 24, Ex. B at 1).  He also performed various construction/home repair/remodeling jobs from 1990 to 2012.  (*Id.*).  He attended Inspection 21 – Home Inspection School from 2013 to 2014 and Middlesex County Vocational & Technical School for welding from 1989 to 1993 (where he graduated Salutatorian).  (*Id.*). Olen is licensed as a public adjuster in Pennsylvania (since 2017) and in three other states, certified (since 2017) as a restoration technician for water damage and fire and smoke damage, and is a member of the American Association of Public Insurance Adjusters (since 2017).  (*Id.*). The CV indicated that, in 2005, Olen won an award of "Retaining Wall Builder of the Year" from Allan Block.  (*Id.*).

　　Having inspected the Property with Coates on July 1, 2020, Olen opined that "the cause of damage to this wall was the vehicle impact."  (Mot. to Preclude, ECF No. 22-4, Ex. A at 3.) "It is my opinion, within a reasonable degree of certainty, that this [wall] would not have fallen on February 24th 2019 if not for this vehicle impact."  (*Id.*).  In reaching this conclusion, Olen focused on how a retaining wall works.  (*Id.* at 2).  He considered the "critical angle of repose"— which is "the steepest angle a granular material can be piled before the face shears off" and varies based on the type of material at issue (e.g., dirt, sand, or stone).  (*Id.*).  In this case, the wall used "deadmen," perpendicular wood beams that go from the face of the retaining wall through the critical angle of repose to help "tie the wall back to the stable soil."  (*Id.*).  "The soil that is filled in between the hill and the retaining wall will have an angle of repose."  (*Id.*).  In turn, "[t]he material outside the critical angle of repose that wants to shear off is retained by the retaining wall" and is called the "sliding wedge."  (*Id.*).  "The land area on top of the sliding wedge needs to be treated with respect."  (*Id.*).

According to Olen, Coates's retaining wall was under constantly changing loads and stresses, with rainwater absorbed by the soil behind the wall increasing the weight of the "sliding wedge" and lubricating the soil thereby raising the chances of failure. (*Id.*). Snow on top of the ground would increase the weight of the "sliding wedge," and winds could cause vibrations within the wall and the "sliding wedge." (*Id.*). Olen used the example of a storm starting with heavy rain and then changing to snow, resulting in the heaviest type of moisture. (*Id.*). "Many times, these storms are accompanied with strong winds." (*Id.* at 2-3). Olen stated that "[t]his retaining wall has stood the tests of time against all of these situations and many times all 3 at once," which "should come as no surprise" because this is what retaining walls are designed to do. (*Id.* at 3). "What they are not designed to handle is being driven into the back of them with a skid steer bucket, followed by the immediate, immense torque of 4 hydraulically driven off road wheels changing direction 180 degrees (from forward to reverse) applying downforce into the sliding wedge and towards the wall." (*Id.*). Olen observed that "[i]t is no surprise the retaining wall failed as a result of the vehicle contact" because "it was not designed to handle this sudden combination of force." (*Id.*).

Olen also addressed whether the loss is covered under the Policy. He opined that the damages "were consistent" with damages covered under the Policy, relying on his experience as a licensed public adjuster and, as in all claims he handles, completing the following steps: "obtain a history from the insured; review relevant documentation and policy information; visually observe the property and the damaged areas; take photographs and measurements; and determine the method and cost of repair." (*Id.*). Olen stated that "[t]he collapsing of the retaining wall is specifically covered if it is caused by 'A. perils described in SECTION 1 – BROAD Named PERILS.' The broad named perils include '6. Vehicles.'" (*Id.*). He also

concluded that none of the exclusions cited by MetLife apply.  As to the exclusion for decay or deterioration, he noted that the wall did not collapse because it was decayed or deteriorated, "[e]verything deteriorates over time, but that doesn't mean that everything is excluded by the policy," and, "[u]nder this policy, just because something is deteriorated and suffers a covered loss, does not mean it is excluded." (*Id.*).  Specifically:

> [T]he policy states that while loss which is caused directly or indirectly by "wear and tear, marring, scratching, aging, deterioration, corrosion, rust, mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself," [sic] it specifically states that "We pay for any direct loss that follows items A. through I. to property described in Coverages A and B not otherwise excluded or excepted in this policy, and then we pay for only the ensuing loss."  In other words, if the retaining wall was deteriorated, but collapses because of a vehicle impact, that ensuing damage, the collapsing from vehicle impact, is covered.

(*Id.*).  "As for the exclusion as part of earth movement," Olen stated that "the earth movement did not cause this loss, it was only the result of the wall coming down from the vehicle impact." (*Id.*).  Noting that "any retaining wall failure, which is specifically paid for and covered by this policy, will cause some level of earth movement," he observed that "for the insurance company to attempt to claim that an earth movement exclusion would apply is purposefully unreasonable at worst and creates policy ambiguities at best, but in either event, coverage would be given." (*Id.*).

In response to Olen's report, MetLife has submitted a supplemental report prepared by Graci dated November 17, 2020.  (Resp., ECF No. 24, at Ex. E).  MetLife deposed Olen pursuant to Federal Rule of Civil Procedure 30(a)(1).  (Mot. to Exclude, ECF. No. 22-5, Ex. B).  At his deposition, Olen acknowledged that he is neither a licensed professional engineer nor a licensed architect, has no other professional licenses, has never testified in any trial as an expert witness,

has authorized no scientific or technical writings, publications, or articles, and is not qualified to offer an opinion as a professional engineer. (*Id.* at 12:3-8, 21:6-12, 44:9-14, 44:19-21, 82:20-22). He never entered into an expert witness agreement, and he has not yet been compensated for his services. (*Id.* at 23:3-11). Explaining his philosophy of helping others and not worrying about whether you are paid as well as his passion for this work, Olen assumed "there would be something [compensation] at some point, but if there isn't, I'm also okay with that." (*Id.* at 22:6-17). Olen further admitted that he did not speak with Todd Pewterbaugh, Trevor Woodward, or Steve Roberts, who were evidently engaged by Coates to inspect the Property. (*Id.* at 43:19-44:3; Br., ECF No. 22-1, at 3). Olen also did not see the Graci report until the day of the deposition. (Mot. to Preclude, ECF No. 22-5, Ex. B at 82:14-16). Asked if he is qualified to refute the opinion of a licensed professional engineer, he answered:

> It depends on perspective. So as far as an engineering perspective as a report, no, but as far as how it applies to an insurance claim, yes.
>
> Q. And you're referring to when an insurance claim is adjusted and how a policy of insurance may or may not be interpreted. Right?
>
> A. Correct.
>
> Q. So it's fair to say that you're not qualified to refute the opinion of a professional engineer with respect to the professional engineer's technical capabilities, academic background and scientific conclusions contained in his or her report. Right?
>
> A. That's correct. Only for how the insurance company tries to apply it to their policy.

(*Id.* at 82:23-83:15).

Olen claimed "expertise in understanding the insurance process as a public adjuster" and primarily expertise "in building retaining walls and actually rebuilding walls that were built improperly and also building new walls that have failed." (*Id.* at 18:10-14.) In preparing his

6

report, he "did a Google search" to confirm "what I learned  --- was trained on," such as the "angle of repose and sliding wedge," and specifically reviewed the Allan Block website.  (*Id.* at 36:13-25).

According to Olen, his opinions were based on the scientific or technical principles of the "angle of repose" and the "density compaction of soil."  (*Id.* at 52:14-19).  He indicated that, because of the soil naturally compacting itself and thereby sticking together over time, a failure would occur soon after the wall is built: "Naturally soil will compact on its own, especially if there is rain involved.  So even if you disturb soil, it will naturally just compact on its own over time.  That's why I gave a time frame of about three years.  And the soil compacts itself."  (*Id.* at 52:20-24).  He provided the example of a construction site where work has stopped.  "Like they're completely exposed dirt when they dig out ---- they start construction sites and then the job gets halted and it sits there for years.  It doesn't collapse, the soil was compacted over time."  (*Id.* at 54:3-7).  As to retaining walls, Olen stated that "you compact it as you go" when building a retaining wall but, even if you did not, "that's when you see the failures in the first --- why I said up to three years, you would see the failure because naturally the water draining through the soil which is naturally compacted."  (*Id*. at 54:8-14).

Olen admitted that he does not know the wall's "angle of repose" before it collapsed.  (*Id.* at 55:19-21).  He also never tested the "density compaction of soil."  (*Id.* at 54:21-23).  Although acknowledging that such a test could be conducted with a nuclear density tester, "I never met an engineer who did require it."  (*Id.* at 54:16-20).

There was no calculation of the "dynamic impact load" of the skid steer when it struck the retaining wall.  (*Id.* at 81:19-82:13).  Indicating his belief that such a test could have been performed when the collision happened and if the testing equipment had already been set up for

the test, Olen admitted that he does not know how to test or measure the "dynamic impact load" as a technical matter and does not "technically" know how the "dynamic impact load" contributes to a potential collapse. (*Id.* at 81:21-82:13). Olen testified that he took no specific measurements during the inspection because he already had an estimate, although he did run a "measuring wheel" to check the approximate measurement of the length of the retaining wall's boundaries. (*Id.* at 47:13-48:11). According to Olen, such measurements would be needed to rebuild the wall but are not required to determine why it failed. (*Id.* at 49:13-22). He does not know the weight of the skid steer or its speed when it allegedly struck the wall. (*Id.* at 63:3-10). Olen also did not test or take any samples of the retaining wall material, but he does know the wall was composed of timber. (*Id.* at 48:13-49:5). He does not know the age of the wall or its maintenance history. (*Id.* at 49:3-5, 83:17-22). However, Olen did testify that "age is --- if the --- the wall it's more important that the wall was --- was built correctly from the start" because, if there is a problem, "you'll never be able to stop it from being a problem," "[i]t wouldn't be --- you wouldn't have something for over 15 years if there was a problem from the start," and "[y]ou just wouldn't be able to maintain it." (*Id.* at 52:6-13). Presented with photographs from Graci's report, Olen agreed that they depict rotten, decayed, deteriorated, and structurally unsound wood. (*Id.* at 91:11-92:10, 95:4-96:9, 99:12-16). But he did not "actually inspect any wood members that have the same appearance as those depicted in Mr. Graci's report." (*Id.* at 99:7-11).

After confirming that the lack of proper drainage could cause or contribute to a wall collapse, Olen admitted he does not know whether the retaining wall was properly drained but attempted to minimize the significance of drainage:

> A. I don't know. However, with my experience, if the wall's been up for an extended period of time, more than likely, it was drained

> properly because the water would have taken it out much sooner.
> It's not like all of a sudden one year the water is going to be more
> forceful and take it out.
>
> If it's been through all the seasons of rain and snow and summer and
> wind and all that.  That would have done its job.  If there was a
> problem with the water, it would have happened early on, because
> those elements are there.
>
> And actually, it's more likely to happen early on from the water
> because the soil on top of it hasn't developed a deep root base.

(*Id.* at 78:2-22).

MetLife has moved to preclude Olen's report and testimony.  (Motion to Preclude, ECF No. 22).  Coates has filed his opposition to this motion (Resp., ECF No. 24), and MetLife has filed a reply brief.  (Reply Br., ECF No. 30).  The Court granted MetLife's motion for leave to file a supplemental reply brief (Mot. for Leave, ECF No. 35; Order, ECF No. 36), and the supplemental reply brief has been docketed (Suppl. Reply Br., ECF No. 37).[2]

## II.    LEGAL STANDARD

A district court has broad discretion in determining the admissibility of evidence.  *See Walker v. Gordon*, 46 F. App'x 691, 694 (3d Cir. 2002).  When faced with a proffer of expert testimony, the trial court must consider "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 579 U.S. 579, 592 (1993)).  "These gatekeeping requirements have been extended to apply to all expert testimony."  *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 147 (1999)).

---

[2]  MetLife has filed a motion for summary judgment, which is pending before Judge Jones.  (Mot. for Summ. J., ECF No. 21).

The admissibility of expert opinion testimony is governed by Rule 702 of the Federal Rules of Evidence.  It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  The Third Circuit has explained that Rule 702 embodies a "trilogy of restrictions" on the admissibility of expert testimony: (1) qualification; (2) reliability; and (3) fit. *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  The party offering the expert must prove each of these requirements by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999), *amended on other grounds by* 199 F.3d 158 (3d Cir. 2000).

## III.    DISCUSSION

According to Coates, Olen "will testify regarding the cause of Plaintiff's loss, and whether this loss would be covered."  (Resp., ECF No. 24, at 15 (citing Resp. Ex. A)).  MetLife argues that Olen is not qualified to render an opinion on the cause of the retaining wall's collapse and that his opinion on causation is neither reliable nor does it "fit" this case.  (Br., ECF No. 22-1, at 6-10).  As to his opinion concerning loss coverage under the Policy, MetLife asserts such

opinions should be excluded as legal in nature.  (*Id.* at 10-12).  The Court finds that, although

Olen qualifies as an expert, his causation opinion does not satisfy either the reliability or the "fit"

requirements.  This Court also finds that he is barred from offering an opinion on the proper

interpretation of the parties' Policy, which includes whether a loss "would be covered" under the

Policy.

### A.    Causation Opinion

#### 1.    Qualification

"Qualification 'refers to the requirement that the witness possess specialized expertise.'"

*Ellison v. United States*, 753 F. Supp. 2d 468, 475 (E.D. Pa. 2010) (quoting *Schneider*, 320 F.3d

at 404).  The Third Circuit has interpreted this prong of *Daubert* liberally, holding that "a broad

range of knowledge, skills, and training qualify an expert."  *Schneider*, 320 F.3d at 404.  As a

result, the Third Circuit instructs that trial courts should not insist on a certain type of degree or

background when evaluating the qualifications of an expert.  *See Waldorf v. Shuta*, 142 F.3d 601,

625 (3d Cir. 1998); *In re Paoli R.R. PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990) ("The language

of Rule 702 and the accompanying advisory committee notes make clear that various kinds of

'knowledge, skill, experience, training, or education,' qualify an expert as such.") (quoting FED.

R. EVID. 702); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (The Third

Circuit has eschewed imposing overly rigorous requirements of expertise and has been satisfied

with more generalized qualifications of experts).  "This liberal policy of admissibility extends to

the substantive as well as the formal qualifications of experts."  *Pineda v. Ford Motor Co.*, 520

F.3d 237, 244 (3d Cir. 2008) (citing *In re Paoli R.R. Yard PLB Litig.*, 35 F.3d at 741) (footnote

omitted).  Therefore, "it is an abuse of discretion to exclude testimony simply because the trial

court does not deem the proposed expert to be the best qualified or because the proposed expert

does not have the specialization that the court considers most appropriate." *Id.* (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)).

MetLife argues that Olen is not qualified to render an expert opinion about the cause of the collapse of the retaining wall because he is "a journeyman landscaper who is now a public adjuster"—and not a professional engineer or architect. (Br., ECF No. 22-1, at 6-7). It asserts that Olen's experience building and rebuilding walls does not make him qualified to opine about the cause of the wall's collapse, he has received no formal training in the scientific or technical attributes of designing, building, or testing retaining walls, and accordingly "[he] has no qualifications of *any kind* that would permit him to render opinions on the complex technical issues of causation of the retaining wall['s collapse] at the Insured Premises in this case." (*Id.* at 6). MetLife emphasizes that, at his deposition, Olen admitted he is not qualified to refute the opinion of a professional engineer. (*Id.*). According to Coates, Olen is a qualified expert because, in addition to being a licensed public adjuster, he has decades of experience working as an award-winning contractor specializing in the building and repair of retaining walls. (Resp., ECF No. 24, at 12-13) (citing Resp. Ex. A). Coates takes issue with MetLife's "journeyman landscaper" characterization, claiming that it trivializes Olen's decades of experience and knowledge and that "Olen's method of building and repairing retaining walls has been reviewed by his peers, who have previously recognized him for skill and expertise in this area." (*Id.* at 13) (citing *DiBartolo City of Phila.*, C.A. NO. 99-1743, 2001 LEXIS 24073, at *3-4 (E.D. Pa. Oct. 16, 2001)). "Further, his work as a public adjuster is subject to licensing boards in several states, including Pennsylvania, demonstrating standards controlling the way in which losses are adjusted." (*Id.*) (citing *DiBartolo*, 2001 LEXIS 24073, at *3-4). Based on his years of experience, Olen purportedly investigated the property and reached his conclusions after

analyzing his observations in conjunction with his knowledge and skill.  (*Id.* at 12).  Coates
further asserts that MetLife has failed to produce any legitimate concerns regarding Olen's
qualifications.  (*Id.* at 12-13).  MetLife responds that Coates has produced no record facts to
support the claim of peer review, Olen's experience building and repairing retaining walls does
not make him qualified to opine about the cause of the wall's collapse, and Olen conceded in his
deposition that he holds no professional education or training that would render him an expert.
(Reply Br., ECF No. 30, at 3).  "Simply put, while MetLife appreciates Mr. Olen's work
experience, he is by no means a qualified expert but rather a contractor doing a favor for
Plaintiff."  (*Id.*).

In its supplemental reply brief, MetLife discusses a recent opinion issued by the
Honorable Harvey Bartle, III in another coverage matter also involving a proffered expert
opinion by a licensed public adjuster on the issue of causation.  (Suppl. Reply Br., ECF No. 37,
1).  In *Balu v. Cincinnati Insurance Co.*, C.A. NO. 19-3604, 2021 WL 1427651 (E.D. Pa. Apr.
14, 2021), the Court granted the insurer's motion to preclude expert testimony as to the cause of
water damage offered by a senior claims adjuster and HAAG Certified Roof Inspector with no
evident experience as a structural engineer, *id.* at *2-3.  According to Judge Bartle, the
qualification requirement is interpreted liberally, but "an expert wishing to testify as to a cause of
damage must have expertise on causation as it relates to the relevant subject matter."  *Id.* at *2
(citing *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987)).  In *Aloe Coal Co.*,
the Third Circuit refused to permit a sales representative (who was often required to determine
the cost of repairing or replacing damaged equipment) to testify as to the cause of a tractor
shovel's fire:

> We are well aware of the liberal policy of permitting expert
> testimony which will probably aid the trier of fact. . . .  But, at a

> minimum, <u>a proffered expert witness on causation must possess skill or knowledge greater than the average layman in determining causation</u>.   Drewnowski did not.   We therefore conclude that the district court abused its discretion in allowing him to testify as an expert on the cause of the tractor shovel fire.

*Id.* at *3 (quoting *Aloe Coal Co.*, 816 F.2d at 114 (alteration in original)).   *Balu* stated that "[t]he present circumstances are strikingly similar to those in *Aloe Coal*."   *Id.* at *2.   Although the Court recognized that the adjuster was no doubt capable of expertly identifying roof damage and the cost to repair it, it concluded that "expertise at identifying and estimating the cost to repair damage is not expertise at identifying the cause of the damage."   *Id.* at *3.   "Cortazzo is not an engineer," and "Plaintiffs have not provided any evidence that he has any expertise by education or experience in opining on the cause of water damage to plaintiffs' pool room roof and interior." *Id.* (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 744).

This Court agrees that a licensed public adjuster—without more—cannot offer an opinion on the cause of a particular occurrence, whether it is water damage to a roof or a retaining wall collapse.   However, Olen is not merely a licensed public adjuster.   Coates presents additional evidence that Olen has some expertise in opining on the cause of retaining wall collapses.   Olen worked "various construction/home repair/remodeling jobs" from 1990 to 2012.   (Resp, ECF No. 24, Ex. B at 1).   As a contractor specializing in retaining walls of various sizes in different soil conditions, he has built walls from scratch and has replaced improperly installed and failed walls. (Mot. to Preclude, ECF No. 22-4, Ex. A at 1).   One of his walls "even had a hidden underground stream that needed to be managed"—and he received an award for this work from the retaining wall manufacturer.   (*Id.* at 1; Resp, ECF No. 24, Ex. B).

Admittedly, Olen (like his counterpart in *Balu*) is not an engineer, and he acknowledged that he cannot offer an opinion as an engineer and cannot specifically refute the opinion of a

professional engineer with respect to the engineer's own technical capabilities, academic

background, and scientific conclusions.  (Mot. to Preclude, ECF No. 22-5, Ex. B at 82:25-83:15).

However, a person need not possess academic training and credentials to qualify as an expert;

practical experience may suffice.  *See Waldorf*, 142 F.3d at 625.  Olen could offer an opinion

based on his own practical experience of building retaining walls and replacing walls that have

failed.  A contractor with such experience would presumably learn how retaining walls "work,"

how they should (and should not be) built, and what could (and does) go wrong causing a wall to

fail and need to be replaced.  In fact, Olen at least purportedly based his causation opinion on the

scientific or technical principles of the "angle of repose" and the "density compaction of soil."

(*Id.* at 52:14-19).  He in turn conducted an Internet search to confirm his understanding of the

basic principles he had learned as a builder and repairer of retaining walls.  (*Id.* at 37:13-38:14).

In contrast, the sales representative in *Aloe Coal Co.* had no design experience, no knowledge or

experience in determining the cause of equipment fires, no training as a mechanic, and never

even operated the construction machinery as part of his job.  *Aloe Coal Co.*, 816 F.2d at 114.  At

the very least, a person with years of wall-building experience knows more about how retaining

walls work and fail than the average layperson.  *Balu*, 2021 WL 1426751, at *3.

The Third Circuit has adopted a liberal approach to the qualification restriction, *see*

*Schneider*, 320 F.3d at 404, and this Court finds that Olen is qualified to offer an opinion on

causation.  However, Olen's causation opinion must also satisfy the reliability and "fit"

requirements.  *See id.*

### 2.    Reliability

In evaluating an expert's reasoning or methodology, a court should consider:

> (1) whether a method consists of a testable hypothesis; (2) whether
> the method has been subject to peer review; (3) the known or

> potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*De La Cruz v. V.I. Water & Power Auth.*, 597 F. App'x 83, 91 (3d Cir. 2014) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 745-46 (3d Cir. 2000)).  "[T]his list is non-exclusive and . . . each factor need not be applied in every case."  *Elcock*, 233 F.3d at 746 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137).  When a court must evaluate an expert's use of "a non-scientific method," it should consider these factors "where they are reasonable measures of the reliability of expert testimony."  *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 152).  The court's gatekeeping role requires that, where an expert "base[s] testimony upon professional studies or personal experience, [he or she] employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.* (quoting *Kumho Tire Co.*, 562 U.S. at 152).

An expert's opinion need only have "good," not necessarily "perfect," grounds.  *In re Paoli R.R. PCB Litig.*, 35 F.3d at 744.  Allowing an expert's opinion is not an endorsement of it. "Good grounds" may exist "for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they have been corrected, the scientist would have reached a different result."  *Id.*  A judge "will often still believe that hearing the expert's testimony and assessing its flaws was an important part of assessing what conclusion was correct and may certainly still believe that a jury attempting to reach an accurate result should consider the evidence."  *Id.* at 745 (citing *In re Paoli R.R. PCB Litig.*, 916 F.2d at 857).  In the end, "the

reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence." *Id.* at 744 (quoting *In re Paoli R.R. PCB Litig.*, 916 F.2d at 857).  The "ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's 'technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results.'" *Id.* (quoting *DeLuca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 956 (3d Cir. 1990)).

Nevertheless, the reliability restriction still prohibits "too great a gap between the data and the opinion proffered." *Oddi v. Ford Motor Co.*, 235 F.3d 136, 146 (3d Cir. 2000) (quoting *Gen Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  Accordingly, the district court must examine the expert's conclusions to ascertain "whether they could reliably flow from the facts known to the expert and the methodology he or she used." *Id.* (quoting *Gen. Elec. Co.*, 522 U.S. at 146).

According to MetLife, Olen's opinion that the retaining wall collapsed because of its contact with the skid steer bucket "is unreliable and lacks any valid scientific analysis because it was secured without the application of any accepted scientific methodology" and instead at best was the result of nothing more than guesswork and speculation.  (Br., ECF No. 22-1, at 7). MetLife argues that "Olen provides no testable hypothesis, did not use a method that has been subject to peer review, provides no known or potential rate of error for his opinion, and describes no standards whatsoever that are relevant to his opinions."  (*Id.*).  It likewise asserts that he cited to no literature as support for his opinions and methodology.  (*Id.* at 9).  MetLife goes on to enumerate what Olen did not do as part of his inspection, ranging from his failure to ascertain the "angle of repose" to not inspecting any wood members of the retaining wall having the same appearance as the rotten, decayed, deteriorated, and structurally unsound wood depicted in the

Graci report photographs.  (*Id.* at 7-8).  Coates responds that Olen, using his experience as a licensed public adjuster and retaining wall contractor, "was able to effectively inspect the damage and make determinations on the cause of loss."  (Resp. ECF No. 24, at 13 (citing Ex. B)).  According to Coates, "his testimony is based on sufficient facts and data of this case (results of Mr. Olen's inspection) and is the product of reliable principles and methods (Mr. Olen's experience and knowledge)," Olen  "applied his knowledge and experience in the field to the results of his inspection to reach his conclusions," and "any arguments over the effectiveness of his testing methods go to the credibility of this witness, which is subject to determination by the finders of fact."  (*Id.* (citing FED. R. EVID. 104(3), 702)).  He argues that, although non-exclusive and unnecessary, many of the reliability factors do apply in this case.  (*Id.* at 13).  Coates specifically states that Olen's building work has been peer-reviewed (in the form of the award he received), his work as a public adjuster is subject to a licensing process, and MetLife has been unable to produce any legitimate concerns about his qualifications.  (*Id.*).  In its reply brief, MetLife takes issue with what it calls Coates's "groundless claim" that "Mr. Olen's testimony is based on sufficient *facts* and *data* and the product of *reliable principles* and *methods*."  (Reply Br., ECF No. 30, at 5).  It thereby observes that his claim is "plainly unsupported by any evidence whatsoever before the Court": "Thus, the 'sufficient facts and data' alleged by Plaintiff are the 'results of Mr. Olen's inspection' without any further factual elaboration because Plaintiff has no evidence to support this unfounded claim.  Likewise, the alleged reliable principles and methods employed are 'Mr. Olen's experience and knowledge' without any further elaboration."  (*Id.*).

The Court agrees with MetLife that Coates does not provide any specific factual support for his broad assertions of sufficient facts and data and reliable principles and methods.  *See In re*

*TMI Litig.*, 193 F.3d at 663 (stating that party offering expert must prove three requirements by preponderance of evidence).  In fact, his response does not sufficiently explain how exactly Olen reached his conclusions.  Coates only addresses two of the eight enumerated factors—peer review and the qualifications of the expert witness—despite his bald statement that many of these factors apply in this case.  As to the first of these two factors, he references an award for his construction work as opposed to an award or honor for any sort of inspection and examination into the causes for a wall to collapse.  Olen has never testified as an expert witness in any trial and has written no scientific or technical publications or peer-reviewed articles. (Mot. to Preclude, ECF No. 22-5, Ex. B at 12:3-8).  In turn, a licensed public adjuster's "expertise at identifying and estimating the cost to repair damage is not expertise at identifying the cause of the damage."  *Balu*, 2021 WL 1427651, at *3.  As to his qualifications, Olen may satisfy the "qualification" requirement (as discussed above), but he is not a licensed engineer or architect, and he admitted that he is not qualified to offer an opinion as a professional engineer and is unqualified to refute the scientific conclusions of a professional engineer (like Graci).  (*Id.* at 82:20-22, 82:25-83:15).

Nevertheless, it is clear from his report and deposition that Olen did purportedly rely on certain basic scientific or technical principles—especially the concepts of the "angle of repose" and the "density compaction of soil."  (*Id.* at 52:14-19; Mot. to Preclude, ECF No. 22-4, Ex. A at 1-3.)  According to his deposition "it wouldn't be --- you wouldn't have something for over 15 years if there was a problem from the start" because "[y]ou just wouldn't be able to maintain it [the wall]."  (Mot. to Preclude, ECF No. 22-5, Ex. B at 52:10-13).  Olen indicated at his deposition that**,** because of the soil naturally compacting itself and thereby sticking together over time, a failure would have occurred earlier:  "So even if you disturb soil, it will naturally just

compact on its own over time.  That's why I gave a time frame of about three years."  (Mot. to Preclude, ECF No. 22-5, Ex. B at 52:18-25, 54:1-14.)  He likewise claimed that, "with my experience, if the wall's been up for an extended period of time, more than likely, it was drained properly because the water would have taken it out much sooner" and "it's more likely [for a collapse] to happen early on from the water because the soil on top of it hasn't developed a deep root base."  (*Id.* at 78:7-22).

As Coates recognizes, "the court must examine the expert's conclusions to determine whether the testimony reliably follows from the facts known to the expert and the methodology used; if too large of a gap exists, the court has the ability to exclude the opinion."  (Resp, ECF No. 24, at 9 (quoting *Keller*, 557 F. Supp. 2d at 675)).  There is too large a gap here between the underlying data, the methodology, and the conclusions.  *See Oddi*, 234 F.3d at 146.  Despite purportedly relying on technical or scientific principles, there is no indication that Olen's apparent methods for ascertaining the cause of a retaining wall collapse implicate an actual testable hypothesis, been subjected to peer review, have a known or potential rate of error, are subject to controlling standards, are generally accepted, are related to reliable methods, or have been used outside of the judicial setting.  *See De La Cruz,* 597 F. App'x at 91.  In any event, he did not "employ . . . the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," such as a professional engineer or an architect.  *Elcock*, 233 F.3d at 746 (quoting *Kumho Tire Co.*, 562 U.S. at 152).

In fact, Olen did not calculate either the critical "angle of repose" or the "density compaction of soil."  (Mot. to Preclude, ECF No. 22-5, Ex. B at 54:21-23, 55:19-21).  He did not determine the weight and speed of the skid steer, and he offered no explanation of a "deep root base" or provided a specific scientific or technical basis for his assertion that the wall was

properly drained because otherwise the water would have already collapsed the wall.  (*Id.* at 63:3-10, 78:7-22, 79:2-7).  He did not take any detailed measurements or samples of the retaining wall material.  (*Id.* at 47:13-48:11).  He does not know the age of the wall.  (*Id.* at 49:3-5).  He acknowledged in his report that the wall's materials ("deadmen") were perpendicular wood beams and testified at his deposition that the photographs from the Graci report depict rotten, decayed, deteriorated, and structurally unsound wood.  (Mot. to Preclude, ECF No. 22-4, Ex. A. at 2; *id.*, ECF No. 22-5, Ex. B at 91:11-92:10, 95:4-96:9, 99:12-16).  But he never actually inspected any of this rotten and structurally unsound wood.  (Mot. to Preclude, ECF No. 22-5, Ex. B, at 99:7-11).  Olen even admitted that does not know how—or even whether—the retaining wall was maintained since its construction.  (*Id.* at 83:17-22).

Accordingly, the Court finds that Olen's causation opinion does not satisfy the reliability requirement.

### 3.    "Fit"

Emphasizing his admission that he is not qualified to refute Graci's opinion, MetLife argues that Olen's causation testimony does not "fit," that is, it would not "help the trier of fact to understand the evidence or to determine a fact in issue."  FED R. EVID. 702(a); *see also Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017).  "This requirement 'goes primarily to relevance.'"  *Kuhar v. Petzl Co.,* No. 19-3900, 2022 WL 1101580, at *9 (3d Cir. Apr. 13, 2022) (non-precedential op.) (quoting *Daubert*, 509 U.S. at 591).  Given the gap that exists between the data and methodology on the one hand and the conclusions rendered on the other hand, this Court determines that Olen's opinion would not assist the trier of fact in this case.  *See id.* ("The Magistrate Judge concluded that the 'expert and the opinions contained therein leave too large a gap between the data presented and the conclusions rendered, and

consequently, it fails to satisfy *Daubert*'s requirements.'  Without coherent evidence and

definitive judgments, it is difficult for us to conclude that the expert's opinions could help a trier

[of] fact 'to determine a fact in issue.'  Fed. R. Evid. 702(a).") (citation omitted).

      **B.**    **Loss Coverage Opinion**

According to MetLife, Olen should be precluded from providing testimony on insurance

coverage because such an interpretation of an insurance contract constitutes an impermissible

legal conclusion.  (Br., ECF No. 22-1, at 10-12).  According to Coates, "Olen will not testify

regarding the construction of insurance coverage, nor his opinions on that process" but instead

will testify as to "whether the loss would be covered."  (Resp., ECF No. 24, at 15 (citing

*GallatinFuels, Inc. v. Westchester Fire Ins. Co.*, 410 F. Supp. 2d 417, 420-21 (E.D. Pa. 2006);

Resp., ECF No. 24, Ex. A)).

Under Pennsylvania law, the interpretation of insurance contracts is a question of law for

the courts to decide.  *See Cont'l Cas. Co. v. Cty. of Chester*, 244 F. Supp. 2d 403, 407 (E.D. Pa.

2003) (citing *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)).  "Whether a

particular loss is within the coverage of an insurance policy is such a question of law and may be

decided on a motion for summary judgment."  *Cont'l Cas. Co. v. Cty. of Chester*, 244 F. Supp.

2d 403, 407 (E.D. Pa. 2003) (quoting *Bowes by Brown v. Estate of Feathers*, 671 A.2d 695, 697

(Pa. Super. Ct. 1993)).  "It is well-settled that expert testimony regarding the interpretation of an

insurance policy is impermissible."  *Nationwide Life Ins. Co. v. Commonw. Land Title Ins. Co.*,

Civil Action No. 05-5165, 2011 WL 204619, at *3 (E.D. Jan. 20, 2011) (citing *Smith v. Cont'l

Cas. Co.*, No. CIV.A.07-1214, 2008 WL 4462120, at *1 (M.D. Pa. Sept. 30, 2008), aff'd, 347 F.

App'x 812 (3d Cir. 2009)); *see also GallatinFuels, Inc.*, 410 F. Supp. 2d at 421 ("As Defendant

correctly argues, Hoffman's opinions on the issue of contract construction would not assist the

jury in understanding coverage, are based solely on Hoffman's subjective interpretation of the policy language, and are impermissible legal conclusions." (citing *McCrink v. Peoples Ben. Life Ins. Co.*, No. 04-1068, 2005 WL 730688, at *4 (E.D. Pa. Mar. 29, 2005)).

In his report, Olen proffered his own interpretation of the language of the Policy's coverage provisions and exclusions.  (Mot. to Preclude, ECF No. 22-4, Ex. A at 3-4).  In addition to quoting the coverage language, he addressed the meaning of the exclusion for decay or deterioration purportedly based on the language of the exclusion and the notion that "[e]verything deteriorates over time, but that doesn't mean that everything is excluded by the policy."  (*Id.* at 3).  As to the exclusion for earth movement, he indicated that any retaining wall failure would cause some movement and accordingly the insurance company's interpretation "is purposefully unreasonable at worst and creates policy ambiguities at best."  (*Id.* at 4).  *See Green v. Zurich Am. Ins. Grp.*, No. CIV.A. 99-3048, 2001 WL 100327, at *6 (E.D. Pa. Aug. 24, 2001) (rejecting opinion that insurance contract is ambiguous because ambiguity is question of law for court), *aff'd*, 313 F.3d 837 (3d Cir. 2002).  Opinion evidence on this topic must be excluded.

IV.     **CONCLUSION**

For the foregoing reasons, the Court grants MetLife's motion to preclude.

BY THE COURT:


_/s/ Lynne A. Sitarski_____
LYNNE A. SITARSKI
United States Magistrate Judge

23